UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AUBREY KELLER, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TD BANK, N.A., et al., | : | NO.  12-5054 |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**L. Felipe Restrepo, U.S. District Court Judge**                    **November 4, 2014**

Plaintiffs Aubrey Keller and Alyxandria Marie Garcia ("Named Plaintiffs") bring this action on behalf of themselves and all other similarly situated individuals (collectively referred to as "Plaintiffs") against Defendant TD Bank, Inc. ("Defendant" or "TD Bank").  Named Plaintiffs are former employees of TD Bank who allege that TD Bank failed to properly compensate employees for time spent working "off-the-clock" on pre- and post-shift security procedures associated with opening and closing the company's bank branches.  The Court granted preliminary certification of the settlement class and collective action and preliminary approval of the settlement on April 15, 2014.  Order Granting  Pls.' Unopposed Mot. Preliminary Approval of Settlement and Other Relief ("Prelim. Order"), ECF Doc. No. ("Doc.") 49. Presently before the Court is Plaintiffs' uncontested motion for final approval of the settlement. *See* Docs. 63-65, 70.  A final fairness hearing was held on October 9, 2014.  Doc. 71.  For the reasons that follow, the Court now grants final certification of the settlement class and collective action, approves the settlement agreement, and awards attorneys' fees, costs, and service payments as detailed below.

I.      **BACKGROUND**[1]

    A.  **Summary of Factual Allegations**

Named Plaintiffs Keller and Garcia are former employees of TD Bank.[2]  Pls.' Third Am. Compl. ("Am. Compl.") ¶¶ 39-40.  Plaintiffs allege that TD Bank failed to properly compensate employees for "off-the-clock" time spent engaging in pre- and post-shift security procedures associated with opening and closing the company's bank branches.[3]  *Id*. ¶¶ 45-66; *see also* Prelim. Br. 6.  Specifically, Plaintiffs allege that they were routinely assigned to open for the business day the bank branch at which they worked.  Am. Compl. ¶¶ 47-48.  During bank opening shifts, they were required to spend approximately fifteen to twenty minutes engaging in "significant" pre-shift security procedures before they were permitted to "clock in." *Id*. ¶¶ 49, 54. Plaintiffs also allege that they were regularly assigned to close the bank at the end of the business day.  *Id*. ¶ 59.  During these closing shifts, employees worked for approximately ten to fifteen minutes on "significant" post-shift security procedures after they had already "clocked out" for the day.[4]  *Id*.  ¶¶ 61-64; *see also* Prelim. Br. 6.

Plaintiffs allege that TD Bank maintained this wage payment system for employees from at least June 2007 until October 2012.  Am. Compl. ¶ 44.  In October 2012, Defendant modified

---

[1]      Except as otherwise specified herein, the Court adopts all defined terms set forth in the parties' Settlement Agreement (Doc. 48-1) for the purposes of this Memorandum.

[2]      TD Bank is comprised of numerous formerly independent banks that have retail bank locations, or branches, along the Eastern Seaboard.  Pls.' Br. Support Pls.' Mot. Preliminary Approval of Class Settlement and Class Certification ("Prelim. Br.") 4, Doc. 40-14.

[3]      To protect Defendant TD Bank from security risks, Plaintiffs do not allege in their complaint each very *specific* security procedure that Defendants required Plaintiffs to perform. *See* Am. Compl. 9 n.1, 11 n.2.

[4]      Paragraphs 60 and 61 of Plaintiffs' Third Amended Complaint reference post-shift security procedures in connection with bank opening shifts; however, this appears to be in error, as Paragraph 59 references "closing the bank" and Plaintiffs' Brief in Support of Plaintiffs' Motion for Preliminary Approval of Class Settlement and Class Certification likewise references "store closing" security procedures.  Am. Compl. ¶¶ 59-61; *see* Prelim. Br. 4, 6.

its timekeeping system to account for this pre- and post-shift security work.  *Id.* ¶ 51.  Because

the claims of the prospective class involve different state law statutes of limitations and thus

different relevant time periods, the class has been divided into four subclasses, which are detailed

further in Section I.B. *infra*.  *Id.* ¶¶ 32-35.

### B.  Procedural History

On September 4, 2012, Plaintiff Aubrey Keller initiated this hybrid putative collective

action under § 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) and class

action under Federal Rule of Civil Procedure 23.[5]  *See* Compl. ¶¶ 14, 22, Doc. 1.  The only state

law claims alleged were violations of the Pennsylvania Minimum Wage Act and the

Pennsylvania Wage Payment Collection Law.  *See id.*  On October 1, 2012, Garcia filed a First

Amended Complaint, Doc. 4, and on May 7, 2013, Garcia filed a Second Amended Complaint,

Doc. 21.  The Second Amended Complaint contained additional named plaintiffs Alyxandria

Marie Garcia and Casmere Williams and added state law claims under the New Jersey Wage and

Hour Law and the New Jersey Wage Payment Collection Law.  Second Am. Compl. ¶¶ 2-3.

Thereafter, Named Plaintiffs sought to add opt-in plaintiffs from other states and to proceed with

a nationwide class.  *See* Prelim. Br. 2; *see also* Pls.' Notices of Opt-In Pls., Docs. 22-27, 35.

After agreeing to mediation, on July 9, 2013, the parties executed and the Court entered a

Stipulation and Order Granting Leave to File a Third Amended Complaint and Staying

Defendant's Answer Date and Proceedings Pending Mediation.  Doc. 32.   The Stipulation tolled

the statute of limitations for Plaintiffs' claims as of June 26, 2013.  Doc. 32.  The parties

mediated the dispute before Magistrate Judge Joel Rosen (retired) on October 17, 2013, and

---

[5]      Although this case was originally assigned to the Honorable Mitchell S. Goldberg, it was
subsequently reassigned to my calendar.

Plaintiffs filed a Motion for Preliminary Approval of the Settlement on December 20, 2013. Doc. 40.

Prior to engaging in mediation, the parties conducted some targeted discovery. *See* Prelim. Br. 2.  Defendant provided class discovery, including the number of potential class members, a breakdown of full-time and part-time employees, a breakdown of employees' exempt and non-exempt status[6], the number of TD Bank retail stores during the relevant class period, and the average hourly wage on a state-by-state basis. *Id.* at 7.  The parties engaged in discovery to ascertain the amount of "off-the-clock" time at issue, most notably by conducting a study involving observations of store opening and closing procedures. *Id.* at 6.  Defendant also provided a sampling of "time-punch data," time records, payroll data, and schedule information. *Id.*

Plaintiffs then filed their Third Amended Complaint on December 23, 2013, which removed Casmere Williams as a Named Plaintiff.  *See generally* Am. Compl.  In their Third Amended Complaint, Plaintiffs sought relief under the wage and hour laws of fifteen states and the District of Columbia, which encompass the locations in which Defendant conducts business. *Id.*  Plaintiffs also maintained their claims under the FLSA. *Id.*  Plaintiffs' FLSA claims were brought as a collective action on behalf of "all tellers, personal bankers, and other similar non-exempt employees presently and formerly employed" by TD Bank who were "subject to Defendants' unlawful practices and policies" within the last three years. *Id.* ¶¶ 16-17.  Plaintiffs' state law claims were brought as a Rule 23 class action "on behalf of all tellers and other similar

---

[6]     Employees who have jobs governed by the FLSA are classified as either "exempt" or "nonexempt"; non-exempt employees are entitled to overtime pay and minimum wage, but exempt employees are not.  *See* 29 U.S.C. § 201 *et seq.*; 29 CFR §§ 510-794.  State wage and hour laws generally apply similar classifications.  *See, e.g.*, Conn. Gen. Stat. § 31-76i; Fla. Stat. 448.110(3).

non-exempt positions presently and formerly employed by Defendants" who were "subject to Defendants' unlawful pay practices" within the applicable statute of limitations period. *Id.* ¶ 25.

On April 15, 2014, the Court preliminary certified a settlement class and collective action and granted preliminary approval of the parties' settlement agreement. The Court preliminary certified, for purposes of settlement only, four Settlement Classes under Rule 23(b)(3). These classes were defined as follows:

- "Settlement Class 1" shall be defined as all non-exempt TD Bank retail store employees who worked in the States of Delaware and/or Rhode Island who engaged in TD Bank store opening or store closing Security Procedures during the period June 26, 2012 through October 16, 2012, plus all Full-Time TD Bank retail store employees who engaged in TD Bank store opening or store closing Security Procedures in said states during the period June 26, 2010 through October 16, 2012;

- "Settlement Class 2" shall be defined as all non-exempt TD Bank retail store employees who worked in the states of Connecticut, Florida, North Carolina, New Jersey, Virginia and/or Vermont who engaged in TD Bank store opening or store closing Security Procedures during the period June 26, 2011 through October 16, 2012, plus all Full-Time TD Bank retail store employees who engaged in TD Bank store opening or store closing Security Procedures in said states during the period June 26, 2010 through October 16, 2012;

- "Settlement Class 3" shall be defined as all non-exempt TD Bank retail store employees who worked in the District of Columbia and/or the states of New Hampshire, Massachusetts, Maryland, South Carolina, New York (excluding Legacy Commerce employees), Pennsylvania and/or Maine and engaged in TD Bank store opening or store closing Security Procedures during the period June 26, 2010 through October 16, 2012; and

- "Settlement Class 4" shall be defined as all non-exempt TD Bank retail store employees who worked in Commerce Bank, N.A. retail stores in New York that were integrated into TD Bank subsequent to the merger between TD Banknorth, N.A. and Commerce Bank, N.A. effective March 31, 2008, who engaged in TD Bank store opening or store closing Security Procedures during the period June 26, 2007 through October 16, 2012.

Prelim. Order 5. The Court also preliminary certified, for settlement purposes only, a collective action opt-in class under §16(b) of the FLSA, 29 U.S.C. §216(b), which consisted of the same

Settlement Classes defined above.  *Id.* at 6.  The Court appointed Justin L. Swidler and Richard

Swartz, of the law firm Swartz Swidler, LLC, to serve as Class Counsel, and designated

Plaintiffs Aubrey Keller and Alyxandria Maria Garcia as Class Representatives.  *Id.*  The Court

further preliminarily approved the settlement as fair, and approved the notice and claim forms

used.  *Id.* at 6-7.

 After the Court granted preliminary approval, on May 22, 2014, the claims administrator

mailed Notice and Claim Forms out to 23,260 potential class members.[7]  Declaration of Brian

Radetich in Supp. of Mot. for Final Approval of Collective and Class Settlement ("Radetich

Decl.") ¶ 7, Doc. 64.  The notice informed each participant of the settlement, the claims they are

releasing, and the formula for calculating each individual's settlement payment; the notice also

provided instructions for submitting a claim form.  Mot. Cert. Settlement Class, Ex. 1 (Joint

Stipulation of Class Settlement and Release, hereinafter "Settlement Agmt.") ¶¶ 2-13, Doc. 40-1.

 The claims administrator received 9,015 timely and valid claims forms and 130 requests

for exclusion.  Fairness Hr'g Tr. ("Hr'g Tr.") 8:2-10, 9:12-10:23, October 9, 2014; Radetich

Decl. ¶¶ 17-18.  The claims administrator did not receive any objections to the settlement.

Radetich Decl. ¶ 19.  The Court held a final fairness hearing on October 9, 2014; no objectors

appeared at the hearing.  Hr'g Tr. 3:9-12.

### C.  Terms of the Settlement Agreement

 The Settlement Agreement provides that TD Bank will pay a maximum/gross settlement

amount of $6,000,000 ("Settlement Amount"); the Settlement Amount is inclusive of all class

member payments, attorneys' fees and costs, class representative service payments, and

applicable taxes and withholdings.  Settlement Agmt. ¶ 3.  Settlement Class members are eligible

---

[7] There were four different notice packages mailed out to individual class members based on their Settlement Class as outlined in Section I.B.  Radetich Decl. ¶¶ 7-9.

to receive "Individual Settlement Payments" under the Settlement Agreement, which are

calculated based on the average number of times each individual engaged in store opening or

store closing security procedures at TD Bank each week during the relevant time period.[8]  *Id.* ¶

7.  The Parties agreed to the following compensation scheme for individual class payments:

> The Parties have agreed to compensation for six (6) minutes for
> store opening Security Procedures and one (1) minute for store
> closing Security Procedures to be paid at the Class Member's
> hourly wage for Part-time employees (unpaid straight time wages)
> and 1 ½ times the Class Member's average hourly wage for all
> Full--time employees as reflected in TD Bank's records (overtime
> wages), plus an additional amount of liquidated damages
> calculated at 25% of unpaid straight time and overtime wages.

*Id.* (footnote omitted).  The Settlement Agreement further provides detailed formulas for

calculating individual settlement payments based on the relevant Settlement Class.  *Id.*   In the

event that the aggregate of all participating class member payments plus attorneys' fees and costs

totaled more than the maximum settlement amount of $6,000,000, the payments would be pro-

rated so that the total payments would equal the difference between $6,000,000 and the

attorneys' fees and costs.  *Id.*  TD Bank will retain any unused funds.  *Id.* ¶ 13(j)(iv).

With respect to attorneys' fees and costs, the Settlement Agreement states that class

counsel intended to file a motion seeking payment of 20% of the gross settlement amount

($6,000,000).  *Id.* ¶ 9.  The Settlement Agreement further states that class counsel would seek

class representative service payments of $7,500 and $2,500 to Named Plaintiffs Keller and

Garcia, respectively.  *Id.* ¶ 10.  These service payments would be paid out of the attorneys' fees

award.  *Id.*

---

[8]      As described above, the relevant time period differs depending on the subclass of each
individual employee.

The Settlement Agreement details the notice and claims process and provides for reminder mailings to prospective class members and handling returned notice packages.  *Id.* ¶ 13. Under the terms of the settlement agreement, class members agree to release all wage and hour claims against Defendant during the class period that are "based upon a class member's claim that he or she engaged in off-the-clock pre-shift and post-shift security procedures."  Pls.' Br. Final Approval of Collective and Class Settlement ("Final Br.") 1; *see also* Settlement Agmt. ¶ 15.

The Parties entered into this Settlement Agreement for the exclusive purpose of settling the disputed claims and resolving this matter.  Defendant does not admit liability or any violation of law whatsoever to the Named Plaintiffs or the other Class Members, individually or collectively.  *See* Settlement Agmt. ¶ 4; Hr'g Tr. 38:18-39:8.        .

## II.  CERTIFICATION OF THE CLASS[9]

### A.  Final Certification Under Federal Rule of Civil Procedure 23

#### i.  Rule 23(a) Requirements

For a lawsuit to be maintained as a class action, four prerequisites must be met:  (1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact that are common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation: the representative parties will fairly and adequately protect the class.  *See* Fed. R. Civ. P. 23(a).

---

[9]     Class Counsel noted at the October 9, 2014, final fairness hearing that Plaintiffs' certification arguments outlined in Plaintiffs' Motion for Preliminary Approval are incorporated by reference into their Motion for Final Approval and that there have been no changes to these arguments.  Hr'g Tr. 42:11-43:1.  Defendant did not oppose final certification for settlement purposes only.  *See id.*

### 1.   Numerosity

There is no minimum number of individuals necessary for certification of a class, and a prospective class that includes over forty members will generally satisfy the numerosity requirement.  *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985).  In this case, there are over 20,000 class members; 9,015 class members will receive payment under the terms of the settlement agreement. Radetich Decl. ¶¶ 5, 18, 22; *see* Hr'g Tr. 8:2-10, 9:12-9:16, 14:25-15:24.  Thus, the numerosity requirement is clearly satisfied here.

### 2.   Commonality

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *Stewart,* 275 F.3d at 227 (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (emphasis omitted)); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527-28 (3d Cir. 2004) (stating that the commonality requirement of Rule 23(a)(2) requires that the prospective class members share at least one question of fact or law in common with each other).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) (internal quotations and citations omitted).  "Their claims must depend upon a common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Certainly, the amount of each claimant's recovery will vary here.  Plaintiffs represented at the Final Fairness Hearing that the amount of claims will range from under $10 to over $1,000, depending on the number of opening and/or closing shifts worked by the claimant.  Hr'g

Tr. 14:25-15:21.  Nevertheless, all prospective class members and the Named Plaintiffs allege in the Third Amended Complaint common issues of law and fact at the core of this case:  in sum, that Defendant's timekeeping and payroll practices and policies related to opening and/or closing shifts resulted in Defendant's failure to lawfully compensate those employees for "off-the-clock" security work.  *See* Am. Compl. ¶¶ 16-18, 25-26.  The Named Plaintiffs and prospective class plaintiffs all used the same timekeeping system during the relevant class periods, which required clocking in and out through an HR computer program that did not allow employees to edit their time "punches" and thus account for time spent on opening and closing shift security procedures.  *See id.* at ¶¶ 50-51, 61-62.  In addition, the Named Plaintiffs and prospective class plaintiffs were all subject to the same policies and practices of Defendant that did not account for "off-the-clock" time in any *other* way.  *See id.* at ¶ 55, 65.  There is no suggestion that all employees were not treated uniformly with regard to these *particular* work activities.  Accordingly, the commonality requirement is satisfied here.

### 3.  Typicality

To satisfy the typicality requirement of Rule 23(a), it must be shown that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Class members are not required to have identical claims or underlying factual circumstances; if the claims at issue arise from the same practice or course of conduct or are based on the same underlying legal theory, the typicality requirement will be satisfied.  *Baby Neal*, 43 F.3d at 58; *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311-12 (3d Cir. 1998).  This requirement is "designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals," *Prudential*, 148 F.3d at 311, and to avoid situations where the legal theories

of the named plaintiffs conflict with the legal theories of the absentees.  *Baby Neal*, 43 F.3d at 57-58.

The Named Plaintiffs' claims in this matter are based on the alleged failure of Defendant to compensate them for the time they spent working, during opening and/or closing shifts, to handle security procedures for the bank branch at which they were employed.  The Named Plaintiffs' injuries are compensation for this "off-the-clock" time spent performing security procedures.  The prospective class alleges the same course of conduct and seeks the same type of relief.  The interests of the Named Plaintiffs thus clearly align with those of the prospective class members and the typicality requirement is satisfied here.

### 4. *Adequacy of Representation*

When making an adequacy determination, the Court must consider (1) the qualifications, experience, and general abilities of the plaintiff's lawyers to conduct the litigation; and (2) whether the interests of the named plaintiffs are sufficiently aligned with the interests of the absentees.  *See Warfarin*, 391 F.3d at 532; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995).  Here, class counsel have considerable experience handling class and collective action disputes.  Mr. Swidler and Mr. Swartz have served as lead counsel in more than 60 federal putative class or collective action lawsuits since 2010, the majority of which concerned wage and hour violations.  Decl. of Justin L. Swidler, Esq. in Supp. of Mot. for Final Approval of Collective and Class Settlement ("Swidler Decl.") ¶ 12.  Mr. Swidler and Mr. Swartz's skills and expertise in FLSA actions were acknowledged by another court in this district earlier this year, in the context of a collective action settlement approval.  *McGee v. Ann's Choice, Inc.*, No. 12-2664, 2014 WL 2514582, at *4-*5 (E.D. Pa. June 4, 2014).  Class counsel have represented the Named Plaintiffs and the prospective class

11

competently and diligently throughout the course of this litigation and have expended

considerable cost and effort to identify, notify, and remind potential class members of the action

and the need to file a claim to recover funds under the Settlement Agreement.

Further, it is clear that Named Plaintiffs' interests are aligned with other prospective class

members.  All performed similar job duties when engaging in "off-the-clock" security work

during opening and closing shifts.  All were subject to and impacted by the same payroll and

timekeeping policies and practices of Defendant related to "off-the-clock" security work during

opening and closing shifts.  And all allege the same harm.  In addition, Named Plaintiffs are

subject to the same calculations for damages under the terms of the Settlement Agreement as the

prospective class members.  Settlement Agmt. ¶ 7.  For these reasons, the adequacy requirement

is satisfied.

### ii.  Rule 23(b)(3) Requirements

If the Court determines that a putative class satisfies the requirements of Rule 23(a), it

must also determine whether the putative class falls into one of the categories enumerated in

Rule 23(b).  Plaintiffs in this action seek certification under Rule 23(b)(3), which provides:

> A class action may be maintained if Rule 23(a) is satisfied and if
> the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy. The
> matters pertinent to these findings include: (A) the class members'
> interests in individually controlling the prosecution or defense of
> separate actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against class
> members; (C) the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; and (D) the likely
> difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  These two requirements are generally referred to as

"predominance" and "superiority."  *In re Hydrogen Peroxide Antitrust Litig.*, 552

F.3d 305, 310 (3d Cir. 2008).

### 1.  Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation, and assesses whether a class action would achieve

economies of time, effort, and expense, and promote uniformity of decision as to persons

similarly situated."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (citations

and internal quotations omitted).  This requirement imposes a more "rigorous obligation" upon

the Court than Rule 23(a)'s commonality requirement.  *See id.*  Where plaintiffs allege a

common course of conduct on the part of the defendant, the predominance requirement will often

be satisfied.  *See id.* at 297-98.  As discussed, Plaintiffs have alleged a common course of

conduct here, specifically, Defendant's requirement, per its policies, procedures, and practices,

that employees work "off-the-clock" in order to perform security procedures when they opened

or closed the specific bank branch at which they were employed.  So the key issue in this case, as

alleged by Plaintiffs, is whether Defendant had a policy, procedure and/or practice of failing to

pay employees for time spent working "off-the-clock" on security procedures during opening

and closing shifts.

Although there are some factual differences between members of each subclass,

including the *amount* of unpaid/"off-the-clock" time spent on security procedures during opening

and closing shifts, these differences impact damages calculations only.  Where there are common

factual issues that determine liability and those issues predominate, the need to calculate

damages on an individual basis will not prevent certification.  *See In re Cmty. Bank of N. Va.*,

13

418 F.3d 277, 306-07 (3d Cir. 2005).  In addition, any variances in the state wage and hour laws that may exist do not pose a case management issue here, where the parties seek to certify a settlement-only class.  *See Warfarin*, 391 F.3d at 529.  For these reasons, the Court finds that issues common to the prospective class predominate of individual issues.

### 2. *Superiority*

To satisfy the superiority test, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *Prudential*, 148 F.3d at 316 (citations and internal quotations omitted).  First, the record in this case does not indicate a strong interest among class members in individually controlling the prosecution of a separate action.  As stated, the putative class in this action is comprised of over 20,000 individuals; only 130 individuals have opted out of the class action.  The average claim is approximately $500.  Hr'g Tr. 14:25-15:5.  So the class action mechanism is particularly appropriate here, because the relatively small amount of potential individual recovery will not incentivize individuals to bring solo lawsuits.  *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997).  At bottom, it would be inefficient and costly to maintain hundreds or thousands of individual lawsuits, all based on extremely similar underlying facts and virtually identical legal arguments.

Second, counsel for both parties are not aware of any other pending individual lawsuits arising from the same allegations as those in this case.  This also suggests a lack of interest in pursuing claims individually.  Hr'g Tr. 21:5-22.  Third, this Court is an appropriate forum for the lawsuit; it has subject matter jurisdiction over the claims in this case and personal jurisdiction over the parties.  Finally, the Court need not consider the manageability of the litigation, since

approval of the proposed settlement would negate any trial.  *See Amchem*, 521 U.S. at 620.

Therefore, the superiority requirement is satisfied here.

Having determined that Plaintiffs have satisfied the relevant requirements of Rule 23 to

obtain class certification, the Court will certify Plaintiffs' proposed Rule classes for purposes of

settlement approval.

### B.  Final Certification Under the FLSA

In order to approve final certification in a FLSA action, the Court must be satisfied that

individuals in the class are "similarly situated."  *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527,

536 (3d Cir. 2012).  To determine whether members of the collective action are similarly

situated, the Court must evaluate a number of factors, including but not limited to:  "whether the

plaintiffs are employed in the same corporate department, division, and location; whether they

advance similar claims; whether they seek substantially the same form of relief; and whether

they have similar salaries and circumstances of employment."  *Id.* at 536-37.  "Plaintiffs may

also be found dissimilar based on the existence of individualized defenses."  *Id.* at 537.  The

Court must "consider[] all the relevant factors and make[] a factual determination on a case-by-

case basis."  *Id.* at 536; *see also Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th

Cir. 2001) (noting certification will not be defeated because plaintiffs came from different

geographical locations and finding that plaintiffs were similarly situated where they all held the

same job title at a number of different geographical locations).

The Court first notes that there have been no objections to the preliminary certification of

the FLSA collective action here.  Furthermore, despite different geographical locations, the opt-

in Plaintiffs are all TD Bank retail employees who, for purposes of this action, engaged in almost

identical job duties:  handling security procedures associated with opening and closing the retail

bank branches.  As discussed above, they all assert the same claims and seek the same form of relief:  compensation for "off-the-clock" time spent engaging in these security practices.  In addition, Defendant has not asserted any defenses during the settlement proceedings or objected to the settlement based on the existence of individual defenses.  The Court is satisfied that, for the purposes of settlement only, the members of the FLSA collective action who submitted a consent form have satisfied the requirements for FLSA collective action certification.

## III.     FINAL APPROVAL OF THE SETTLEMENT

### A.  Fairness of the Class Action Settlement

Having certified the proposed class action under Rule 23, the Court must also evaluate the fairness of the class action settlement pursuant to Rule 23(e).  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009).  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).  The law favors settlement of class and collective actions, in order to conserve scarce judicial resources by avoiding formal litigation, and "[t]hese economic gains multiply when settlement also avoids the costs of litigating class status."  *Gen. Motors*, 55 F.3d at 784.  Nevertheless, the Court must act as the guardian of the rights of absent class members who may be bound "by the operation of res judicata even though [these absent] plaintiffs are not the real parties to the suit."  *Id.*  Where, as here, settlement negotiations took place before class certification and the parties seek class certification and settlement simultaneously, the Court must be "doubly careful in evaluating the fairness of the settlement."  *Id.* at 805 (quoting *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir.1971)).

The Third Circuit in *Girsh* identified nine factors that guide this Court's evaluation of whether the proposed settlement is "fair, reasonable, and adequate" under Rule 23; these factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 156-57 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).  Since the settlement here resulted from arm's length negotiations between experienced counsel, there was sufficient discovery, and there were no objectors and only a small percentage of opt-outs, the settlement is entitled to an "initial presumption of fairness."  *Gen. Motors*, 55 F.3d at 785.

Plaintiffs represent that all $6,000,000 (plus certain claims administration costs) will, in fact, be paid by Defendant to settle the claims in this matter.  Final Br. 1; Radetich Decl. ¶ 2.  Specifically, approximately $4,507,791.05 will be paid to class members, and $292,208.95 will be paid to cover employer taxes.  Radetich Decl. ¶ 22.  Prior to the pro rata sharing calculation, the aggregate settlement payments to all participating class members totaled $5,179,888.40.[10]  *Id.*

---

[10]     Due to the claims administrator's receipt of a small number of late claims after the submission of Plaintiffs' Final Brief but prior to the evidentiary hearing, there may be extremely minor adjustments to this figure.  *See* Hr'g Tr. 7:21-9:16.  Accordingly, this total is approximate, but any difference between this figure and the final total should be so minute that it will not impact the Court's analysis.

### i.   Complexity, Expense and Duration of Litigation

This first *Girsh* factor is intended to capture "the probable costs, in both time and money, of continued litigation, *Gen. Motors*, 55 F.3d at 812 (internal quotations and citation omitted), and weighs in favor of approving the settlement here.  Given the size of the class, the complexities associated with litigation involving "off-the-clock work"—such as the need for documentation and representative testimony from employees at the large number of TD Bank branches implicated in this litigation—and the likely long duration of such litigation, a settlement at this stage avoids the significant costs and risks associated with protracted litigation.  Further, the involvement of numerous state law statutes (and four corresponding state law class subgroups), in addition to the federal statute here, would enhance the complexity of the litigation process.[11]  For these reasons, this factor weighs in favor of settlement.

### ii.   Reaction of Class to the Settlement

The second *Girsh* factor also clearly weighs in favor of settlement.  As stated, not a *single* class member of over 20,000 objected to the settlement and only 130, or less than one percent of the class, requested to opt out of the class.  These facts indicate consent on the part of the class to the terms of the settlement.  *See, e.g.*, *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (finding that second *Girsh* factor favored settlement where 29 of 281 class members objected to the terms of the settlement); *Bredbenner*, 2011 WL 1344745, at *12 (noting that the second *Girsh* factor weighed in favor of settlement where there were no objectors to settlement and less than one percent opted out).  Accordingly, the reaction of the class strongly supports the approval of the settlement here.

---

[11]     As discussed, these state law statutes would nevertheless not render this action unmanageable.

### iii.   State of the Proceedings and the Amount of Discovery Completed

In evaluating the third *Girsh* factor, the Court assesses "the degree of case development that class counsel have accomplished prior to the settlement,"  in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *Gen. Motors*, 55 F.3d at 813.  The Court should measure this factor from the commencement of the proceedings in the class action.  *Id.*

Class counsel represents that although further litigation of this case would require more discovery, the parties have completed sufficient discovery to understand the strengths and weaknesses of the case and appropriately negotiate and recommend a settlement.  Final Br. 8. The Court agrees.  As stated, the parties engaged in some discovery prior to mediation.  More importantly here, the parties conducted a time study wherein they observed employees engaging in the pre- and post-shift security procedures at issue to assess the amount of "off-the-clock" time involved in each.  In addition, Defendant provided Class Counsel with sampling of "time-punch data," time records, payroll data, schedule information, and documents relating to the time-keeping system.  All in all, the parties spent over one year litigating and negotiating a resolution in this case before reaching a settlement with the assistance of Judge Rosen.

The Court finds that the settlement reached here resulted from informed negotiations between experienced counsel who fully appreciated the merits and risks of this case.  *See, e.g.*, *Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 312 (E.D.  Pa. 2012) (finding third factor weighed in favor of settlement, despite the early stage of the case, where there had been interview of employees, review of payroll, timekeeping and policy documents, and an informal inspection of

the facility at issue).  Accordingly, the Court finds that the third *Girsh* factor weighs in favor of settlement approval.

### iv.   Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors also weigh in favor of approving the settlement in this case.  These two factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  *Prudential*, 148 F.3d at 319.  In balancing these considerations, the Court "should not press into the merits of the case and instead rely to a certain extent on the estimation provided by class counsel, who is experienced with the intricacies of the underlying case.  *Bredbenner*, 2011 WL 1344745, at *13.

Plaintiffs note that there are several risks of non-recovery by class members in this action.  First, Plaintiffs would need to prove that pre- and/or post-shift security work completed by Defendant's employees was not *de minimus*, as *de minimus* work is not compensated under the FLSA and many parallel state wage and hour laws.  Plaintiffs believe that the amount of time at issue here would defeat any *de minimus* work defense presented by Defendant; however, Plaintiffs acknowledge that there is a possibility the Court may rule otherwise.  Second, Plaintiffs note that Defendant has asserted that its policies required employees to notify Defendant of any "off-the-clock" work.  Defendant further asserts that it is not liable to Plaintiffs due to these policies, and even if liable, its conduct was not willful, which limits Plaintiffs' recovery.  Plaintiffs again acknowledge that, while they believe they have the stronger arguments on these issues, there is risk associated with litigating these issues that is incorporated into the settlement.

With regard to the risk of establishing damages, Plaintiffs note the inherent difficulty in establishing damages in an "off-the-clock" case such as this where there has been no recording

of the time at issue.  This difficulty is magnified by the large size of the class and number of

bank branch locations involved.  Although Plaintiffs' burden of proving damages is lower where

an employer did not keep accurate time records, as alleged in this case, Plaintiffs would still be

required to establish that they are entitled to some damages for uncompensated, "off-the-clock"

security work.  *See Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296-97 (3d Cir. 1991).  As

Plaintiffs also point out, establishing damages on a class-wide basis would require evidence in

the form of time studies and representative testimony.  Presenting such evidence would likely

require the assistance of a statistician and a vocational expert, and this evidence would

presumably be countered by defense evidence suggesting that Plaintiffs' damages calculations

were unreliable.

Because of the risks present in this case, which could result in no recovery by class

members, that are eliminated by the certainty of an immediate cash payout pursuant this

settlement, the Court finds that the fourth and fifth *Girsh* factors weigh in favor of settlement.

### v.  Risks of Maintaining the Class Action Through Trial

While the continued significance of this sixth *Girsh* factor in the settlement-only context

is unclear, *see Prudential*, 148 F.3d at 321, the Court finds that this factor at least weighs

moderately in favor of settlement.  The Court may, at any time before final judgment, decide to

decertify or modify a class if the class proves to be unmanageable.  Fed. R. Civ. P. 23(c)(1)(C).

Defendant may well choose to challenge the certification of a litigation class if the case were to

move forward.  The Court finds the likelihood of decertification low in this case, but any

challenge would increase both the length and expense of the litigation.

### vi.  The Ability of Defendant to Withstand a Greater Judgment

The seventh *Girsh* factor examines whether Defendant "could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001). The Court finds this factor to be neutral in this case. The parties have presented no evidence regarding Defendant's ability to pay a greater judgment, and even if Defendant has the ability to pay more, it does not mean it would be *required* to pay more. *See Warfarin*, 391 F.3d at 538 (noting that "the fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached.") Therefore, the Court finds that this factor does not weigh either in favor of or against settlement approval.

### vii.  The Range of Reasonableness of the Settlement in Light of the Best Recovery and All the Attendant Risks of Litigation

The eighth and ninth *Girsh* factors are often considered together and "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. In weighing these two factors, the court must decide "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. The Court should compare the amount of the proposed settlement with "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing" to make this determination. *Id*. (internal quotations and citation omitted).

Under the terms of the settlement, class members will recover approximately $4.8 million in unpaid wages, overtime, and other damages in the aggregate. Plaintiffs calculate that this represents approximately 66% of the $7.25 million total possible recovery of the class. Prelim. Br. 19-20. As Plaintiffs point out in their final brief, this percentage is above what many other courts in this district have approved. *See, e.g.*, *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455,

462 (E.D. Pa. 2006) (approving settlement that represented 20% of best possible recovery and noting courts that have approved settlements with even lower ratios).  Moreover, Plaintiff has represented that *all* class members who have submitted claims forms will recover *more* from the settlement than their actual lost wages.  So these class members are more than fully restored to where they would have been but for Defendant's alleged unlawful policies, procedures and/or practices.  Accordingly, the Court finds that the final two *Girsh* factors also weigh in favor of settlement.

### viii.   Other Factors

The Third Circuit in *Prudential* identified a number of other factors that it suggested might also be useful to evaluate, in light of the "sea-change in the nature of class actions" since *Girsh*.  148 F.3d at 283.  Of particular relevance here, the Court finds that the underlying issues in this case have fully matured for adjudication, since Defendant changed its timekeeping policy in October 2012, when the class period closes, to account for time spent on pre- and post-shift security work.  *See id.*; *see also Bredbenner,* 2011 WL 1344745, at *16.


In sum, the Court concludes that, after the consideration of these factors and the presumption of fairness to which the settlement is entitled, the Rule 23 state law class action settlement is fair, reasonable, and adequate.

### B.  Fairness of the Collective Action Settlement

In order to be bound by a FLSA collective action settlement, potential class members must affirmatively "opt in."  *See Lusardi v. Lechner,* 855 F.2d 1062, 1070-71 (3d Cir. 1988).  If they do not choose to opt in, they can bring a separate suit at a later time.  *See id.*  This stands in

contrast to a Rule 23(b)(3) "opt out" class action.  As a result, the Court in the FLSA collective action does not serve the same role as the guardian of absentee class members' rights.

When evaluating a settlement of FLSA claims, the Court must decide whether the settlement is a "fair and reasonable res[o]lution of a bona fide dispute over FLSA provisions." *Lynn's Food Stores*, *Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982).  For the same reasons discussed above, the Court finds the settlement fair.  A proposed settlement will be held to resolve a bona fide dispute where the settlement "reflect[s] a reasonable compromise over issues, such as . . . back wages, that are actually in dispute" and it is not a "mere waiver of statutory rights brought about by an employer's overreaching.  *Id.*  This requirement is most certainly met here, where the Plaintiffs brought suit in federal court over allegedly uncompensated time and the settlement is designed to provide due compensation.  For these reasons, the Court approves the settlement of the FLSA collective action claims.

### C.  Attorneys' Fees and Expenses

Plaintiff's counsel seeks an award of $1,200,000 in attorneys' fees and costs.  Final Br. 19.  This represents approximately 20% of the common fund created by the Settlement Agreement.  *Id.*  There have been no objections to the proposed amount of attorneys' fees and costs.  *Id.* at 23.

Two methods may be used in the Third Circuit for calculating attorneys' fees in class or collective action lawsuits:  the lodestar method and the percentage-of-recovery method.  *Gen. Motors*, 55 F.3d at 820-21.  In the Third Circuit, "[t]he percentage of recovery method is generally favored in cases involving a common fund" because it "allow[s] courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *Prudential,* 148 F.3d at 333.  Further, the percentage of recovery method is the prevailing

methodology used by courts in the Third Circuit for wage and hour cases.  *Bredbenner*, 2011 WL

1344745, at *19.  For these reasons, the Court will apply the percentage of recovery method

here.

The Court must consider seven factors when evaluating the appropriateness of an

attorneys' fee award under the percentage-of-recovery method:

> (1) the size of the fund created and the number of persons
> benefitted; (2) the presence or absence of substantial objections by
> members of the class to the settlement terms and/or fees requested
> by counsel; (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by
> plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  The Court should

also "cross-check the percentage award at which [it] arrive[s] against the 'lodestar' award

method, which is normally employed in statutory fee-award cases."  *Id.*

### i.  Size of the Fund and the Number of Persons Benefitted

In the Third Circuit, courts have approved as reasonable attorneys' fees awards ranging

from approximately 19% to 45% of the common fund.  *See Gen. Motors,* 55 F.3d at 822; *Ripley,*

287 F.R.D. at 315.  "As a general rule, the appropriate percentage to be awarded to class counsel

decreases as the size of the fund increases."  *Ripley*, 287 F.R.D. at 314 (quoting *Bredbenner*,

2011 WL 1344745, at *19).  Class counsel's requested fees, which represent approximately 20%

of the $6 million gross settlement fund, are at the low end of this range and are consistent with

fee awards approved in this Circuit and in the country for similar wage and hour cases.  *See*

*Bredbenner*, 2011 WL 1344745, at *21 (approving an attorney fee award that was 33% of the

common fund and listing relevant percentages of recoveries in wage and hour cases, all of which

were at least 30%).  Given Plaintiffs' representation that Defendant will pay out the entire $6

million to resolve the dispute, the Court finds that this factor weighs in favor of finding the attorneys' fees award reasonable here.

### ii. The Presence or Absence of Substantial Objections By Class Members

As discussed, there have been no objections to any aspect of the settlement here, including the attorneys' fees award. Such an absence favors awarding the requested fees without reduction. *See Rite Aid*, 396 F.3d at 305. Accordingly, the Court finds that this factor weighs in favor of finding the attorneys' fees award reasonable.

### iii. The Skill and Efficiency of the Attorneys Involved

As noted, class counsel in this matter have considerable experience handling class and collective action disputes, serving as class counsel in more than 60 federal putative class or collective action lawsuits since 2010, most of which concerned wage and hour violations. Also as noted, class counsel have represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation. Examination of class counsel's time sheets reveals that they provided Plaintiffs with efficient representation.[12] The Court finds that time billed to the various tasks involved in this litigation, including drafting of filings, communication with the parties and counsel, discovery, and other tasks, reflects that the attorneys worked in an efficient and cost-conscious manner. For these reasons, this factor also weighs in favor of awarding the requested attorneys' fees.

### iv. The Complexity and Duration of the Litigation

This case was filed over two years ago, but it has involved only a limited amount of motion practice by class counsel. The parties reached a settlement here before any dispositive

---

[12] The timesheets reflect approximately 720 billed hours of attorney time devoted to this matter and approximately 75 hours of billed paralegal time. Doc. 63-2.

motions were filed.  Discovery was exchanged between the parties, but this discovery was targeted.  While the Court has noted some of the complexities involved in this case, it does not find that this case was unusually or especially complex when compared to other class and collective actions.  The Court thus finds that this factor weighs only moderately favor of awarding the requested fees.

### v.  Hours Worked and the Risk of Non-Payment

As noted above, class counsel expended over 700 hours of their time litigating this case and working toward a favorable settlement.  Class counsel took this case on a contingent fee basis and agreed to waive all costs if there was no class recovery.  While there has been no indication that Defendant would be unable to satisfy a judgment, as discussed, there was some risk that Plaintiffs' claims would fail.  Therefore, there was a risk of non-payment under the contingency arrangement.  *See Ripley*, 287 F.R.D. at 315.  Having assumed this risk and devoted significant time to this matter, the Court finds that this favor weighs in favor of awarding the requested fees.

### vi.  Awards in Similar Cases

As stated above, courts in this Circuit have approved settlements of 19% to 45% of the settlement fund as reasonable.  As class counsel's requested fee is on the lowest end of this range, this factor weighs in favor of awarding the requested fees.

### vii.  Lodestar Cross-Check

The lodestar cross-check "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorney's work."  *Rite Aid*, 396 F.3d at 305-06.  Class counsel indicates that they expended 719.8 attorney hours on this matter and applied a blended attorney rate of $450 per hour (calculated by combining a $500 per hour partner rate with a $350

per hour associate rate, with approximately 2/3 of hours billed by partners), which totals $323,910.  To this, counsel added $35,775 for 79.5 hours of attorney time expected to be billed after the submission of the Final Brief; $6,366.50 for 74.9 billed paralegal hours at a blended rate of $85 per hour; and $2,550 for 30 hours of anticipated paralegal time.  In total, the lodestar calculated by Plaintiffs equaled $368,601.50.

The lodestar cross-check results in a multiplier of slightly above 3, which is within the range of one to four that is frequently awarded in common fund cases in the Third Circuit. *Prudential*, 148 F.3d at 238.  Even if any prospective time is removed from this calculation, the requested award still falls within this range.  As a result, the Court finds that the lodestar cross-check confirms the reasonableness of the attorneys' fee award here.

### D.  Costs

Class counsel has requested an award of costs of approximately $70,000 to cover the complaint filing fee, subpoena invoices, mileage and parking, the observational study discussed above, mediation, the outgoing call notice campaign, and a deficiency call campaign.  Pls.' Statement of Costs, Doc. 70.  There have been no objections to class counsel's request for costs. In light of the documentation of these costs provided by counsel and the circumstances of this case, the Court finds the requested award of costs reasonable here.

### E.  Service Payments to Named Plaintiffs

Finally, class counsel seeks service payments of $7,500 and $2,500 for Named Plaintiffs Keller and Garcia, respectively.  Such service payments are designed to compensate named plaintiffs for the services they provided during the course of litigation and settlement, the risks they incurred, and to reward the public service that they performed by contributing to the enforcement of mandatory laws.  *See Bredbenner*, 2011  WL 1344745, at *22.  Because the

service payment requested here will be drawn from the attorneys fee award, rather than the common fund, it will not impact Defendant or the public and thus the Court need not subject the payments to intense scrutiny.

Counsel represents that Ms. Keller assisted with the litigation by identifying witnesses and providing information about Defendant's pay practices, security procedures, job duties, bank branch locations, and other information that was "necessary to ultimately obtain the result provided." Swidler Dec. ¶ 7.  Ms. Keller also participated in mediation and settlement discussions by phone and in meetings with class counsel, and she reviewed and provided feedback on discovery responses.  *Id.*  Ms. Garcia provided information on Defendant's policies, pay practices and security procedures and assisted with discovery.  *Id.* ¶ 8.

It is clear that the class members here all benefited from the assistance provided by the Named Plaintiffs, and the service payments sought to reward their efforts are consistent with awards granted in similar cases.  *See Bredbenner*, 2011 WL 1344745, at *23-*24 (awarding $10,000 service payments to each of eight named plaintiffs and listing cases awarding comparable payments).   Accordingly, the Court finds the requested service payments here reasonable and will award them to Named Plaintiffs as requested.

## IV.    CONCLUSION

For the reasons set forth above, the Court certifies the Rule 23 state law class action and the FLSA collective action, approves the proposed settlement agreement in full, awards class counsel the attorneys' fees and costs as requested, and awards service payments to Named Plaintiffs as requested.  An implementing order follows.